Scott A. McMillan, SBN 212506
Michelle D. Volk, SBN 217151
Sean E. Smith, SBN 288973
**The McMillan Law Firm, APC**
4670 Nebo Dr., Suite 200
La Mesa, CA 91941-5230
Tel. 619-464-1500 x 14
Fax. 206-600-5095

Attorneys for Plaintiff,
Lycurgan, Inc.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYCURGAN, INC. d/b/a ARES ARMOR,<br>                    Plaintiff,<br>          v.<br>B. TODD JONES, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and DOES 1-10,<br>                    Defendants. | CASE NO. 14-CV-1679 JLS (BGS)<br><br>**DECLARATION OF DANIEL G. O'KELLY IN SUPPORT OF PLAINTIFF LYCURGAN, INC.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Judge: Hon. Janis L. Sammartino<br>Dept.: 4A<br>Date: November 6, 2014<br>Time: 1:30 P.M. |

## DECLARATION OF DANIEL G. O'KELLY

I, Daniel G. O'Kelly, declare as follows:

1.    I am not a party to this action, and if called before this court or any other court I could and would testify competently to the following from my own personal knowledge, except as to those matters I state on information and belief, and as to those matters I believe them to be true.

2.    This declaration is made in support of Lycurgan's opposition to the motion to dismiss filed by Defendant B. Todd Jones, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives  ("the Government").

3.      I presently operate the International Firearm Specialist Academy (IFSA).  IFSA offers the ability for a firearm professional to become accredited as a Certified Firearm Specialist. Such accreditation serves as the benchmark by which firearm professionals may be gauged. CFS certification establishes that a person is a competent professional in the field of safe and accurate firearm and ammunition handling, and identification.   My qualifications are set forth at length further herein.

4.      Attorney Scott McMillan of the McMillan Law Firm contacted me on September 23, 2014.  I was asked to review the materials and information in order to develop an opinion regarding the nature and classification of the 5804 polymer items known as unfinished receiver blanks which were seized on March 15, 2014 when Special Agents of the Bureau of ATF executed a Search Warrant at 180 Roymar St. Oceanside, California.

5.      During the course of my investigation, review of materials, inspection of a representative sample of the unfinished receiver blank, and based upon my 35 years of experience and training with firearms, ammunition and the use, manufacture and design of them, as a Police Officer and a Federal Agent, including having been a supervisory Officer and supervisory Special Agent, I have arrived at the following opinions summarized as follows:

a.      The 5804 items at issue are not "firearms" as defined in 18 U.S. C. Section 921 (a) (3).

b.      The 5804 items at issue are not a "firearm frame or receiver" as defined in 27 CFR subsection 478.11, which defines a "frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Assuming for the sake of discussion, even if that unfinished lower receiver had been finished to the state known in the Firearms

Industry as a "stripped AR-15 receiver", that "finished" receiver still would not satisfy the elements of a "receiver" as defined in 27 CFR subsection 478.11, which defines a "frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

c. The 5804 items at issue are not "a frame or receiver," even without reference to that definition of a receiver set forth in 27 CFR subsection 478.11, and wholly relying on the standards which the ATF has published in prior determination letters, the subject unfinished receiver is an "unfinished" blank based on the criteria relied upon in prior determinations.

d. The 5804 items at issue are not contraband.

**BACKGROUND**

6. I have extensive experience in the field of firearms and other weapons, both lethal and less-lethal, and their use in law enforcement. I was employed with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) as a Special Agent for over 23 years, with a prior 10.5 years as a full-time Police Officer. A true and correct copy of my current curriculum vitae is attached hereto as **Exhibit 1**.

7. By way of formal education, I attended Indiana University from fall, 1975 to January, 1981. I earned a Bachelor's degree from Indiana University in English. Prior to attending Indiana University, I attended Valparaiso University from fall 1974 to spring 1975.

8. In my law enforcement career, I served as a Patrolman, Field-training Officer, firearm instructor, range-master, armorer, National Academy staff member, undercover agent and Detective.

9. In addition to my firearm expertise, I have extensive experience

1  investigating arsons, suspicious fires, bombings and explosives incidents. Some
2  of these investigations have gained National attention and have resulted in
3  Special Service Awards being presented to me by ATF.

4       10.    I also have considerable management experience, having served as
5  the General Manager for Parker Oil Company. I managed the ATF undercover
6  program at its National Academy.  I was the Supervisory Special Agent for the
7  State of Delaware, for which I received a Special Service Award.

8       11.    Most recently, since 2003 I have operated a licensed,
9  privately-owned property management company in the State of Florida.

10       12.    While employed by the BATFE, I served in the field, as a Senior
11  Special Agent and an in-service instructor.  In my capacity as an in-service
12  instructor, I have presented seminars on all aspects of firearms, ammunition and
13  explosives.  Cumulatively, I have taught thousands of law enforcement personnel
14  about firearms, ammunition and explosives.

15       13.    While employed by the BATFE, I also served as the lead Firearm
16  Technology Instructor at the ATF National Academy.  I was on staff at the
17  National Academy for 5.5 years.  While there I  co-wrote the curriculum taught to
18  new BATFE agents and investigators.

19       14.    Currently, I am a firearm-range instructor, certified with ATF,
20  Federal Law Enforcement Training Center (FLETC), Indiana Law Enforcement
21  Academy (ILEA), National Rifle Association (NRA).

22       15.    I presently hold various certifications in impact weapons training,
23  scenario training and simulator training.

24       16.    Personally, I maintain a large collection of firearm reference books
25  and other material.  I am a collector of ammunition and firearms, a builder of
26  firearms, and a hand-loader of ammunition.

27       17.    I have an extensive background as an "Armorer," with certifications
28  from 13 firearm companies. I have been recognized by the Federal Court as an

1   expert on the topic of firearms since 1990 and regularly attend the firearm

2   industry trade shows, maintaining contact with manufacturing company

3   representatives.

4       18.    I have taught seminars at/for the following law enforcement

5   agencies, associations and organizations:

6       a.     Federal Law Enforcement Training Center (FLETC)

7       b.     International Law Enforcement Academy (ILEA) -Gabarone,

8            Botswana (Africa)

9       c.     International Law Enforcement Academy (ILEA) - Budapest,

10           Hungary

11       d.     ATF National Academy

12       e.     Indiana Law Enforcement Academy

13       f.     Florida Intelligence Unit

14       g.     United States Coast Guard

15       h.     United States Air Force

16       i.     United States Attorney's Office

17       j.     Florida Department of Law Enforcement

18       k.     Florida Public Safety Institute

19       l.     Hillsborough Community College

20       m.    Valencia Community College

21       n.     New College of Florida

22       o.     Sarasota County Technical Institute

23       p.     Transportation Safety Administration (TSA)

24       q.     International Association of Law Enforcement Firearm Instructors

25           (IALEFI)

26       r.     Florida Division of the International Association for Identification

27           (FDIAI)

28       s.     Property and Evidence Association of Florida (PEAF)

t.     Numerous County Sheriff' Departments and large city police departments

19.    I have qualified for the following Instructor Certifications:

a.     Indiana Law Enforcement Academy Firearm Instructor

b.     Federal Law Enforcement Academy Firearm Instructor

c.     NRA Law Enforcement Firearm Instructor

d.     FireArms Training Simulator (FATS) (Train the Trainer Course)

e.     Simunitions Scenario-Based Training (Train the Trainer Course)

f.     Pressure Point Control Technique (PPCT) Instructor

g.     Aerko International Chemical Weapons Instructor

h.     Youth Crime-Gun Interdiction Initiative (YCGII) Instructor

20.    I have received the education and the certifications for the following Specialized Training:

a.     Basic ATF Firearm Nexus School

b.     Advanced ATF Firearm Nexus School

c.     Advanced ATF Ammunition Nexus School

d.     Advanced ATF (European) Firearm Nexus School

21.    I have undertaken independent research on firearms technology at the following U.S. firearm factories or reference collections: Ruger, Pine Tree Castings, Springfield Armory, Colt, Mossberg, U.S Military Academy, Smith & Wesson, Knight's Armament, Diamondback, The Smithsonian Institute, Kel-Tec CNC, Patriot Ordnance Factory, Windham Weaponry, Arms Tech Ltd., STI and North American Arms.

22.    I have undertaken independent research on firearms technology at the following foreign firearm factories or reference collections: Fegarmy and HPL (Hungary), FabriqueNationale and Liege Proof House (Belgium), Vektor (South Africa), SIG Sauer, Heckler & Koch, Walther, BWB, BKA, Ulm and Kiel Proof Houses (Germany), Glock, Steyr, HGM and AWR (Austria), Holland & Holland

1  and the Ministry Of Defense Pattern Room (England), CZ and Proof House

2  (Czech Republic).

3      23.    I have undertaken independent research on firearms technology at

4  the following U.S. ammunition factories: Hornady, 3D ammunition, Lake City

5  Army Ammunition Depot, Starline Brass, Sierra Bullets, Winchester-Olin. .

6  Independent research at foreign ammunition factories: MFS (Hungary),

7  Sellier&Bellot (Czech), PMP and New Generation (South Africa), Hirtenberger

8  (Austria).

9      24.    I held a "Top Secret" U.S. Government security clearance between

10  September 1988-November 2011.

11     25.    I am an "armorer" or in layperson's terms, a "firearms" mechanic,

12  and I have received "Armorer" certifications by the following manufacturers:

13  Beretta, Colt, Smith & Wesson (pistol and revolver), Remington, Fabrique

14  Nationale, Ruger, DS Arms , Springfield Armory, Glock, SIG Sauer, and Heckler

15  & Koch.

16     26.    I am a member of a number of professional associations, including:

17  a.    National Defense Industrial Association (NDIA)

18  b.    International Ammunition Association (IAI)

19  c.    ATF Ammunition Research and Identification Network (ARIN)

20  d.    National Rifle Association (NRA) Benefactor Member

21  e.    National Shooting Sports Foundation (NSSF)

22                **TESTIMONY AS AN EXPERT IN OTHER MATTERS**

23     27.    I have provided expert testimony on these matters, regularly and

24  continuously since 1990.  Prior to November 13, 2011, during my 23 year career

25  as an ATF Special Agent, I provided testimony in numerous court cases involving

26  ATF investigations.  I was repeatedly found qualified to testify as an expert

27  witness  in U.S. District Court beginning in 1990. As I am now retired, I don't

28  have access to the list of cases in which I provided testimony.

28.     During the last 2.5 years since retirement, I've testified or provided expert opinions in, or am in the process of testifying or providing expert opinions in:

a.     *U.S. vs. Courtnee Brantley* (August 2012) U.S. District Court, Middle District of Florida

b.     *Florida vs. Malik Williams*, 13CF003404A (12/4/13)

c.     *U.S. vs. Theodore Hammond*, E. District of Virginia (3/14)

d.     *Jacquelin Rosenbloom vs. David Morgan, et al,* U.S. District Court Northern District of Florida, 3:13-CV-00160-RS-CJK (4/14)

e.     *Florida vs. Helen Hope-Johns*, 13-547-CF-O (JRS) (5/14)

**COMPENSATION**

29.     IFSA was compensated at a rate of $225 per hour for the efforts in developing and articulating the opinions set forth here.  At the time of the preparation of this Declaration, we had not yet prepared or tendered the first billing to Lycurgan's counsel.

**Investigation, Review of Materials, Inspection of Exemplar**

30.     In order to arrive at my opinions set forth above in paragraph 5, I undertook the following "Investigation, Review of Materials, Inspection of Exemplar":

    a.     I spoke with Scott A. McMillan, the attorney for Lycurgan, Inc..  Mr. McMillan also provided me with the following written materials:

        i.     Complaint for Equitable Relief, Or in the Alternative for Damages, and For Attorneys Fees According 28 U.S.C. §2465(b)(1)(A); Demand for Jury Trial filed in U.S. D.C. So. Dist. Cal., Case No. 14-01679, with exhibits.

        ii.     Notice of Motion and Motion to Dismiss Complaint filed in U.S. D.C. So. Dist. Cal., Case No. 14-01679, with Memorandum and Declarations of Agents McCracken and Marks.

        iii.     First Amend Complaint for Damages; Deprivation of Civ Rights; Relief; Jury Demand, U.S. D.C. So. Dist. Cal., Case No. 14-00548, with exhibits.

        iv.     Emergency Application for an Order for Expedited Rule 34 Inspection and to Continue hearing Date and Related Filing Deadlines filed on October 13, 2014, in U.S. D.C. So. Dist. Cal., Case No. 14-01679.

        v.     Court case of *United States v. Podhorn*, 2006 U.S. Dist. LEXIS 16712.

        vi.     Court case of *United States v. Prince*, 2009 U.S. Dist. LEXIS 54116, 7-8 (D. Kan. June 26, 2009)

        vii.     Court case of *United States v. Prince*, 593 F.3d 1178 (10th Cir. Kan. 2010).

        viii.     Letter of May 15, 2014 from Michel & Associates to Bureau

1    of Alcohol, Tobacco, Firearms and Explosives, Asset

2    Forfeiture and Seized Property Division re Notice of

3    Forfeiture Proceedings, Agency Case Number:

4    786010-14-0023, Seizure No.: 01,02,03,04

5   b.   I spoke with Dimitri Karras, the CEO of Lycurgan, Inc..

6   c.   I spoke with Chris Cook, the President of EP Arms, LLC.  Mr. Cook

7    is the designer and manufacturer of the polymer unfinished  receiver

8    blanks at issue. Mr. Cook provided me the width measurement of the

9    "biscuit" around which the unfinished lower receiver is molded.

10    Specifically, it is .661 inches.

11   d.   I obtained the dimensional specifications for the width of the fire

12    control cavity for the AR-15 finished lower receivers, i.e., .690

13    inches.

14   e.   Scott McMillan provided me an exemplar of the subject unfinished

15    lower receiver which I have been told is the same or substantially

16    similar to the 5804 items seized from Ares Armor.

17   31.   The following exhibits are those that I reference herein:

18   a.   Exhibit 'A' is the July 20, 2013, letter that Attorney Jason Davis sent

19    to Earl Griffith, in his capacity as the Chief of the Firearms

20    Technology Branch, ATF.  I understand that the item referred to in

21    this letter is the same or similar to the 5804 items seized from Ares

22    Armor.

23   b.   Exhibit 'B' is the February 7, 2014 letter that Earl Griffith, in his

24    capacity as the Chief of the Firearms Technology Branch sent in

25    response to Jason Davis's letter of July 20, 2013 (Exhibit 'A').

26   c.   Exhibit 'C' is the March 4, 2014 letter by which Jason Davis replied

27    to Earl Griffith's letter of February 7, 2014 (Exhibit 'B'.)

28   d.   Exhibit 'D' is an undated letter from Earl Griffith written to respond

1    to Jason Davis's letter of March 4, 2014.

2    e.    ///

3    f.    ///

4    g.    Exhibit 'G' is the May 17, 2013 letter from the ATF to Doug Hughes

5          of Kenney Enterprises, Inc..

6    h.    Exhibit 'H' is the July 15, 2013 letter from the ATF to Tilden Smith

7          of 80 Percent Arms.

8    i.    Exhibit 'I' is the May 5, 2005 letter from the ATF to Bradley Reece

9          of Palmetto State Defense, LLC.

10   j.    Exhibit 'J' depicts unfinished lower receivers and jigs.

11

12   **Basis for Opinion 1: The 5804 items at issue are not "firearms" as defined in**

13   **18 U.S. C. § 921 (a)(3).**

14        32.    In reference to the correspondence from ATF to Mr. Davis on this

15   issue, the ATF repeatedly cites 27 CFR subsection 478.11, referring to the

16   definition of a "firearm frame or receiver", as "that part of a firearm  which

17   provides housing for the hammer, bolt or breechblock and firing mechanism, and

18   which is usually threaded at its forward portion to receive the barrel". This

19   multi-pronged definition is not applicable to that part which ATF has ruled to be

20   the receiver of an AR15-type firearm.  Nor is that definition applicable to the part

21   which ATF deems to be the receiver of numerous other models of firearm.  And

22   the definition is inconsistent with several of ATF's Rulings as to which part of a

23   particular  model of firearm is the receiver.   Thus, even if one of these polymer

24   receiver blanks were to be completed, it would not satisfy the multiple prongs of

25   this definition.

26        33.    In order to be a "receiver", the item must, among other things, house

27   the bolt or breechblock. A finished AR15 lower receiver; that being the part that

28   ATF has held for decades to be a "receiver", does not house the bolt or

1  breechblock. While it is hereby acknowledged that all firearms utilize either a

2  bolt or a breechblock, the AR15 type firearm utilizes a bolt rather than a

3  breechblock.  The bolt of an AR15 type firearm is housed in the part commonly

4  known as the "upper receiver".   The ATF  has always held that the upper receiver

5  for an AR15 type firearm is not a "receiver" and therefore not a "firearm".

6      34.    Further, the lower receiver of an AR15 type firearm is not threaded

7  at its forward portion to receive the barrel. It in fact does not receive the barrel at

8  all. Again, it is the "upper receiver" of the AR15 that is threaded at its forward

9  portion in order to receive the barrel, and does in fact receive the barrel.

10      35.    The lower receiver of an AR15 only bears two of the four features

11  listed by ATF in their own definition of a "receiver". The other two features are

12  found in the upper receiver, which ATF does not consider to be a firearm.

13      36.    Conversely, ATF contradicts their own logic, that which was used to

14  rule an AR15 lower receiver as a firearm and an AR15 upper receiver to be

15  nothing. For example, both the FAL-type rifle, and the AR15-type rifle, have an

16  "upper receiver" and a "lower receiver". On both models, the upper receiver is

17  threaded at its forward portion to receive the barrel, and it houses the

18  bolt/breechblock.  On both models the hammer, and complete firing mechanism

19  are in the lower receiver. Therefore, the same two features are found in the upper

20  receiver and the same two features are found in the lower receiver. But ATF has

21  ruled in the case of the AR15-type firearm, that the lower receiver is the firearm,

22  and the upper receiver is nothing of consequence.

23      37.    Conversely, on the FAL-type firearm, ATF has ruled that the upper

24  receiver is the "receiver" (firearm) and that the lower receiver is nothing of

25  consequence. Again, neither receiver on either of these models falls within more

26  than half of the description given in 27 CFR Section 478.11.

27      38.    As further evidence of the inadequacy of ATF's definition of a

28  receiver, note the example of the Ruger "Standard Model" .22 caliber pistol. This

1   pistol has an upper receiver, which houses the bolt/breechblock and is threaded at

2   its forward portion to receive the barrel. It is ruled by ATF to be a firearm. The

3   lower receiver of the Ruger, which is much larger and which houses the hammer

4   and other firing mechanism, (all in common with the AR15 lower receiver) is

5   considered nothing of consequence. Neither of the Ruger "receivers" falls within

6   more than half of the description given in 27 CFR Section 478.11.

7        39.     Another example of the inadequacy and lack of logic in this

8   definition, is the Heckler & Koch (H&K) line of semi-automatic rifles (models

9   HK91, G3, HK93, HK94, MP5). On each of these rifles, just like an AR15 or

10  FAL type firearm, the upper receiver houses the bolt/breechblock, and receives

11  the barrel at its forward portion. ATF has ruled that the upper receiver of an H&K

12  type firearm is the receiver/firearm. However the lower receiver, which houses

13  the hammer and firing mechanism is deemed by ATF to be nothing of

14  consequence.

15       40.     This same set of circumstances apply to many further examples as

16  follows; all recoil-operated, locked-breech pistol models that have been

17  manufactured by the millions by manufacturers such as Colt, Smith & Wesson,

18  Glock, Sig Sauer, Heckler & Koch, Ruger, etc.

19       41.     Other such examples, are the M1, M1A/M14, M1 Carbine, and

20  Ruger Mini 14 series of rifles. Millions of these rifles have been manufactured

21  since the 1930's. The part of each of them which ATF has deemed to be the

22  receiver, houses the bolt/breechblock and is threaded at the forward portion to

23  receive the barrel, however, the hammer and firing mechanism are not housed in

24  said part. The hammer and firing components are part of a separate "trigger

25  group", and are not housed in the receiver. Another parallel example is the

26  Thompson "Tommy Gun" (M1921-28 and M1) series of rifles and  machine guns,

27  all of which have an upper receiver which receives the barrel and houses the bolt.

28  ATF has always ruled that the upper receiver is the firearm. The lower receiver of

these guns, which is detachable, just as in the AR15, FAL and H&K series, houses the hammer and firing components, and is deemed to not be a firearm.

42. The UZI series of rifles and machine guns is another example. The upper receiver, receives the barrel and houses the bolt, it is deemed the firearm. The lower, which is detachable and which houses the hammer and firing components is deemed to not be a firearm.

43. There are so many more examples which can be cited here. Usually, the only examples of firearm receivers which do fulfill all prongs of the definition of a receiver, as described in 478.11, are the receivers of most manually-operated firearms.

44. Manually-operated firearms are those which, must be manually manipulated by the shooter after each shot is fired, in order to reload the chamber for a subsequent shot. Specifically, these are the firearms known as revolvers, and those with falling-block actions, rolling-block actions, lever actions, pump actions, and bolt actions.

45. This fact is also confounded due to a bolt-action upper receiver that was designed and marketed by at least one, if not several manufacturers. The example which comes to mind is the one marketed by Safety Harbor Firearms, in Safety Harbor, Florida. It is chambered for the .50 BMG cartridge. This bolt-action "upper receiver" is designed to pin onto the lower receiver of an AR15 type firearm, replacing the original upper. In doing so, the rifle changes from its original self-loaded method of mechanical operation, to a manually-operated, bolt-action method of mechanical operation. The salient point is that this bolt action "upper" is in every way, identical to the receiver found on every bolt-action, manually-loaded firearm for the last 140 years.

46. In approximately 2009, shortly after these became available to the public, myself and at least one other ATF Agent that I recall, received an email from Richard Vasquez, the then acting Chief of ATF's Firearm Technology

1   Branch (FTB). In the email, Vasquez stated that the bolt-action .50 BMG upper
2   was being considered a firearm by FTB. The other Agent whom I recall,
3   responded to Vasquez by asking for the number of the ruling on that issue. The
4   request was ignored. To this day, these bolt-action uppers have never been ruled
5   to be receivers/firearms by ATF. This is another example of the disparity in the
6   application of this definition.

7       47.     It is noteworthy that the previously described firearms (AR15, FAL,
8   H&K series, M1, M1A/M14, M1 Carbine, Mini 14, Thompson, UZI, all
9   recoil-operated and locked-breech pistols), as well as other unnamed examples
10  are self-loading firearms. This refers to the fact that they were designed so that
11  after each shot is fired, the chamber is automatically reloaded by the power of the
12  ammunition.

13      48.     It is a fact that the definition of a "receiver" in Title 27 of the Code
14  of Federal Regulation is facially flawed, as applied, because it only applies to
15  manually-loaded firearms. In the case of nearly all self-loaded firearms, only half
16  of the definition is applicable to the part which ATF has deemed to be a firearm
17  by the Agency's own definition.

18      49.     My final example is the fact that Ammunition is defined under 18
19  U.S.C. Section 921 (a) (17) (A) as Cartridges, primers, cases bullets or propellant
20  powder designed to be used in a firearm.  This means that cartridge cases by
21  themselves are ammunition, primers by themselves are ammunition and
22  propellant powder designed to be used in a firearm is ammunition by itself,
23  however, ATF has ruled for decades that blank cartridges (a case containing a
24  primer and propellant powder) are NOT ammunition.

25      50.     For these reasons, and based on my inspection of an exemplar of the
26  subject unfinished lower receiver, my opinion is that:

27          The 5804 items at issue are not "firearms" as defined in 18
        U.S.C. Section 921 (a) (3).
28          The 5804 items at issue are not a "firearm frame or receiver"

as defined in 27 CFR subsection 478.11, which defines a "frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Assuming for the sake of discussion, even if that unfinished lower receiver had been finished to the state known in the Firearms Industry as a "stripped AR-15 receiver", that "finished" receiver still would not satisfy the elements of a "receiver" as defined in 27 CFR subsection 478.11, which defines a "frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

**Basis for Opinion 2: The subject items are not "receivers" even under the criteria used by the ATF in other instances.**

51.     In reading the correspondence between ATF and Jason Davis in the undated letter marked Exhibit D, ATF states that "*[i]ndexing is sufficient to require classification as a firearm receiver.*" This decision seems to be based on a leap in logic, there is an inconsistency that exists due to ATF having not ruled that a blank receiver, along with a jig that is designed for the completion of such a receiver blank, does not qualify as a firearm, even if the jig is attached to the blank.

52.     The only purpose of a completion jig is to locate the necessary holes and other areas on a blank, where material is to be removed. Further, a jig is a precise tool/instrument which prevents the holes or voids from being miss-located. Any indexing that is drawn or etched on a blank, or even indicated by color difference, allows room for error, and error could prevent the resulting finished receiver from actually being usable if the holes and voids are so miss-located as to not allow the proper fit and interaction of the parts which they are intended to accommodate.

53.     Further, on October 20, 2014, I interviewed Mr. Chris Cook by telephone. Mr. Cook is the President of E.P. Arms, and the designer and manufacturer of the polymer receiver blanks at issue. In the interview, he stated that the biscuit used to manufacture the blank is made first, then cured for two

1    days. After which it is placed into a mold, and then liquid plastic of the same

2    composition as the biscuit is used to fill the mold. This disproves ATF' s

3    allegation that the receiver is completed and then the fire control cavity is

4    back-filled. Mr. Cook stated that the only reason for the biscuit, is that there is a

5    problem of shrinkage when molding plastic, and the use of the biscuit precludes

6    any shrinkage. He further stated that it is not intended to be used as an index for

7    machining, and that the width of the biscuit is .661 inches at its widest point. This

8    proves that it does not serve as indexing, because the fire control cavity of a

9    finished AR15 receiver is .690 in width. Therefore, an additional width of .029

10   inches of material must be removed in addition to the biscuit, in order for the fire

11   control components to fit into the receiver.

12        54.     Further, since another court in *United States v. Prince*, already ruled

13   that AK47 flats with indexing are not receivers, (in contrast to ATF's prior ruling

14   that they were) the same logic extends that an AR blank with indexing is not a

15   receiver.[1]  In addition…ATF refers to indexing as "*indicating the approximate*

16   _____

17        [1] "The court finds that the metal flat shipped to Prince is not a firearm. The

18   court carefully considered the expert testimony of Agent Adam Galbraith, and
     reviewed the material submitted by the government concerning ATF opinions.

19   However, the court simply does not believe that a flat piece of metal with laser

20   perforations and holes constitutes a "receiver," i.e., a "firearm." Rather, the flat
     piece of metal is somewhat akin to a piece of paper with lines drawn on it as a

21   guide to make a paper airplane. Although making the paper airplane might be the

22   intended use, it is not an airplane until it is properly folded. Until that time, it is a
     patterned piece of paper. Simply put, this court has no evidentiary or legal basis

23   for holding that a flat piece of metal with laser perforations and some holes

24   constitutes, ultimately, a "firearm." It may become part of a firearm at some point,
     but not until further work has been accomplished to allow it to secure the stock,

25   chamber, barrel and other parts. Until that time, it is not even a true component of

26   a firearm, only a potential component of a firearm. The statute, as written, does not
     extend that far. Because this court finds that the flats are not "firearms," selling

27   flats is not illegal conduct." *United States v. Prince*, 2009 U.S. Dist. LEXIS

28   54116, 7-8 (D. Kan. June 26, 2009), reversed on other grounds in *United States v.*

1  *locations of the holes to be drilled for the selector...*". There is nothing

2  approximate in the design and manufacture of a firearm. A firearm is a machine

3  which generates tons of chamber pressure per square inch at the moment of firing,

4  and there is no room for approximation. A machine is useless unless it works.

5  Using approximate locations to drill holes and do other machining processes

6  would result in an unsafe, or inoperable and useless item. By comparison, the idea

7  of drilling the holes and doing the machining processes that are necessary in the

8  building of a car motor as "approximate" would be laughable.

9       55.    The next basis for my opinion concerning Exhibit D is the comment

10  by ATF that "*...because the fire control area is created during the manufacturing

11  process through the use of a biscuit*", is another leap in logic. A "fire control

12  area" when it exists, is a void rather than a solid body. In other words, a hollow

13  space.  Neither a hollow space nor a void is created by building additional

14  material around a pre-existent body of solid matter.

15       56.    Consider the logic concerning the idea that a void is created by

16  pouring liquid into a mold around a pre-inserted solid object. A parallel situation

17  is one where in an ice cube is placed into a drinking glass. Is a void created where

18  the cube resides? Hardly. However the inside of the entire glass was a void, just

19  as the entire inside of a mold prior to insertion of a biscuit. The cube or biscuit in

20  either situation is the only place where there is not a void. Further, when water is

21  poured into the glass around the cube, one might assert that "the space taken by

22  the cube is the only space where there is not liquid". This is true. However, if the

23  cube is removed while the water is still in a liquid state, the water seeks a new

24  level as the cube is moved, and no "void" ever exists. On the other hand, once the

25  water in the glass is made solid by freezing, it is bonded to the cube, and even if

26  the cube had been made from colored water, there is no way to remove that cube

27

28  *Prince*, 593 F.3d 1178 (10th Cir. Kan. 2010).

from the now solid block of homogenous material. In the same way, the biscuit becomes bonded to the liquid plastic once it cools and hardens to the same consistency as the biscuit. It is no longer a "biscuit", but a contrastingly-colored area within the whole.  If the liquid was of a dissimilar materials it may be a valid point, but the biscuit and the remainder of the blank are made of the same material.  Any application of heat used in an effort to remove it would result in the melting of an undetermined amount of material, with no boundaries.

57.    The opportunity to physically inspect the exemplar of the polymer blanks which Scott McMillan provided me was helpful towards developing this opinion.

58.    On page 6 of Exhibit D, ATF refers to the point "... *at which an AR 15 blank is classified as a firearm is when it has been indexed for or machined in the fire-control recess area.*" Consider the flawed logic in equating the making of marks on the outside of an object to "a substantial amount of machining".  ATF asserts that a blank becomes a firearm when the locations for these machining processes become indicated on the blank.  How can indicating a location where a machining process is to be completed equate to having done the machining processes? This is the equivalent to ruling that a shoebox becomes a birdhouse upon drawing the location of an entry hole.

59.    According to ATF, it follows then that if a person who is an experienced finisher of these, bought some receiver blanks, and merely due to his experience was able to use a felt-tip pen to mark them with dots and a rectangle indicating the "approximate" location of the holes, that the blanks would then be ruled as firearms.

60.    Further, ATF states that receiver blanks which have not been ruled as firearms are such, because they "*require a substantial amount of machining*". Again, how can "a substantial amount of machining" and the addition of markings, be logically equivalent?

61.     Concerning the comment by ATF in Exhibit D, "*ATF has long held that items such as receiver blanks*," "*castings*" or "*machined bodies*" *in which the fire control area is completely solid and un-machined have not yet reached a "stage of manufacture" to be classified as a "firearm receiver".* These items are a single piece of metal. That require a substantial amount of machining to the vital areas of the firearm (sic)".

62.     By the very verbiage used, ATF ends this very quote by contradicting themselves in calling the item which they state has "*not yet reached a "stage of manufacture" to be classified as a "firearm receiver" as a "firearm".* Further, treating the Ares blank differently than the items described above is yet another leap in logic, because the Ares blank is a single solid piece of plastic, which "*requires a substantial amount of machining to the vital areas of the [item]".* The only difference is that this example is plastic vs. metal.

63.     When referring to the letter from ATF to Mr. Doug Hughes, dated 5/17/13 (**Exhibit G**), it is obvious that ATF is only concerned with the following five steps of "milling out the fire control cavity, drilling of selector-lever hole, cutting of trigger slot, drilling of trigger pin hole and drilling of hammer pin hole. ATF allows the other nine [substantial] machining processes that Mr. Hughes has already done to his submitted AR15 blank. By ATF's admission, these include, "*front and rear assembly/pivot-pin holes drilled, front and rear assembly/pivot detent pin holes drilled, selector-retainer hole drilled, magazine release and catch slots cut, trigger-guard holes drilled, rear of receiver drilled and threaded to accept buffer tube, buffer-retainer hole drilled, pistol-grip mounting area faced-off, drilled and threaded, and magazine well completed".* By contrast, the Ares blank has had only 8 of these 9 operations, yet ATF would have them be considered firearms.

64.     When referring to the letter from ATF to Mr. Tilden Smith, dated 7/15/13 (**Exhibit H**), we see that ATF examined his submitted AR15 receiver

blank, which had the same nine machining processes completed as Mr. Hughes submitted blank. The Smith blank additionally had a tenth machining operation completed. That of having had the "*receiver end-plate area machined*". ATF then granted in their letter to Mr. Smith that the five steps that they had deemed crucial, and which had not been done to the Hughes blank, (milling out the fire control cavity, drilling of selector-lever hole, cutting of trigger slot, drilling of trigger pin hole and drilling of hammer pin hole) had not been done, and the blank was "*not sufficiently complete to be classified as the frame or receiver of a firearm and thus would not be a firearm*"

65.     When referring to the letter from ATF to Mr. Bradley Reece, dated 5/5/14, (**Exhibit 'I'**), we see that ATF examined his submitted AR receiver blank. In their letter to Mr. Reece, they begin by quoting their definition of a "*receiver blank*":

> "*The term 'receiver blank', is used to describe forgings, castings or machined bodies (defense articles) such as AR15 receiver castings, AK receiver flats, etc., (sic) in various stages of folding/machining which are not classified as firearms.*"

66.     At this point alone, ATF has contradicted their own definition by having ruled the Ares blank as a firearm, although it has had fewer machining operations done to it than the two prior examples. The ATF continues in the letter with a further contradiction of the last point made, by saying

> "*...that an AR10 type receiver blank which has had <u>no machining of any kind performed in the area of the trigger/hammer (fire control) recess</u> might not be classified as a firearm.*"

[Exhibit I]

67.     This begs the question: how is it that a blank with only 8 previously approved machining processes done to it can be classified as a firearm and another blank which had eleven machining processes be ruled as not a <u>firearm</u>?

68.     ATF then gives an answer to this question, but an answer which flies in the face of their ruling on the Ares blank.  They go on to say that *"[s]uch a receiver blank could have all (emphasis theirs) other machining operations done, including pivot-pin and takedown-pin hole(s) and clearance for the take-down pin lug, but must be completely solid and un-machined in the fire control recess area."* Again, the Ares blank falls within this description. They continue with, *"We have determined that in order to be considered "completely solid and un-machined in the fire control area the takedown pin lug clearance area is less that 1.6 inches measured immediately forward of the front of the buffer-retainer hole."* [Exhibit I]

69.     ATF then grants that although there have been several machine operations performed on the blank, *"The sample is completely solid and un-machined in the fire control recess area and, accordingly, is not a firearm as defined in the GCA."*  Again, this is consistent with the Ares blank, which has had even fewer operations completed on it.

70.     These examples of ATF's rulings on AR blanks illustrate that their real concern is with machining of the fire control area, a feature which the Ares receiver does not possess.

71.     Also, in Exhibit D, the next statement is nonsense: *"However, in each of those examples the fire control cavity was the same material as the receiver itself..."* Again, they are referring to the item as a "receiver" after having ruled that it is not one. They go on to refer to a "cavity" where there is none, while referring to what they admit is a solid block of homogenous metal.  They then support Ares's claim that the Ares blank is not a receiver, by adding that a blank which is made of a homogenous material has no fire control cavity, *"...and the material filling the fire control cavity (sic) is integral to the item, therefore the fire control cavity had not been created."*

72.     On page 5 of Exhibit D, the statement that *"ATF has long held that*

1  *indexing of the fire-control area is sufficient to require classification as a firearm*

2  *receiver*"… is inconsistent with other rulings.  Otherwise, why is the possession

3  of a completion jig and a receiver blank not considered a firearm?  The jig has no

4  other use, and when attached to a receiver blank, the blank is now indexed for

5  completion.

6      73.     Further ATF has recently clarified that they make their rulings **based**

7  **on what something is designed to be used for**, and not what it may potentially

8  be used for or how it is actually used.  See, e..g, the recent ATF rulings

9  concerning the use of forearm braces on handguns not being a violation of the

10  NFA as a Short-barreled Rifle, and that the installation of one does not change the

11  classification of the firearm to one under the purview of the National Firearms

12  Act, even when fired from the shoulder. Therefore, under the same rationale, the

13  possession of a jig and a blank would be a firearm, whereas there is no other use

14  for said combination of parts.

15      74.     The lack of a ruling by ATF which states that the possession of a

16  receiver blank and a completion jig equal a receiver, is inconsistent with ATF's

17  prior rulings. For example, 26 USC 5845 (b) states that;

18

19      " … *any part designed and intended solely and exclusively, or*

20      *combination of parts designed and intended, for use in converting a*

21      *weapon into a machinegun,…*"

22

23  This law has been used for decades by ATF concerning devices which have only

24  one purpose. It is the logic behind ATF's ruling that a device commonly called a

25  "Drop-In Auto-Sear", is a machinegun by itself, because it has no other purpose

26  than to convert a semiautomatic AR15 into a fully automatic firearm. This law is

27  also used as the logic behind ATF's ruling that a device commonly called a

28  "Lightning Link" or "Auto Connector", is a machinegun by itself, because it has

1  no other purpose than to convert a semiautomatic AR15 into a fully automatic

2  firearm.

3        75.    A recent reversal of this type of ruling is the recent allowance that

4  the attachment of a plastic bottle or oil filter to the muzzle of a firearm for

5  cleaning purposes is acceptable, despite the ruling decades earlier, that a

6  soda-bottle adapter for a threaded muzzle is a Silencer by itself, and is subject to

7  registration as such with ATF under the National Firearms Act.

8        76.    In summary, this ruling as well as many others by ATF, display a

9  lack of logic and consistency, which has created a climate in the firearm industry

10  wherein it is nearly impossible for the reasonable man to be able to operate in

11  good faith within the law.

12        77.    For these reasons, and based on my inspection of an exemplar of the

13  subject unfinished lower receiver, my opinion is that:

14       The 5804 items at issue are not "a frame or receiver," even without

15       reference to that definition of a receiver set forth in 27 CFR

16       subsection 478.11, and wholly relying on the standards which the

17       ATF has published in prior determination letters, the subject

18       unfinished receiver is an "unfinished" blank based on the criteria

19       relied upon in prior determinations.

20

21  **DECLARATION OF RESIDENT AGENT BRICE P. McCRACKEN**

22        78.    I have reviewed the undated Declaration of Resident Agent Brice P.

23  McCracken ("R/A McCracken"), bearing an ECF file date of 9/22/2014, which in

24  pertinent part states:

25                          * * *

     2. I am familiar with the property at issue in case

26       14-cv-00548-JLS-BGS, specifically the seizure by ATF of 5804
     EP80 firearms seized from Ares Armory on March 15, 2014.

27       3. These 5804 EP80 firearms seized from Ares Armory were
     manufactured at the direction of EP Armory and sold to ARES

28       Armor as evidenced by invoices seized by ATF at the offices of EP

Armory. Further, EP Armory does not have a Federal Firearms License (FFL) to lawfully manufacture firearms.

4. The ATF has determined that the EP80 firearms seized from Ares Armor were sufficiently manufactured to be as a receiver, which is a firearm under Title 18, United States Code, Section 921(a)(3)(B).

5. The EP80 firearms, which were manufactured at the direction of EP Armory and seized from Ares Armor, do not contain a manufacturer's marking and serial number which would allow the firearms to be traced by law enforcement.

* * *

[See, Case 3:14-cv-01679-JLS-BGS Document 7-3 Filed 09/22/14 Page 2 of 2]

79.    As I explain at length above, I disagree with R/A McCracken's conclusions that the unfinished blanks seized from Plaintiff Lycurgan Inc., d/b/a Ares Armor are "firearms."

80.    27 CFR 478.11 defines in pertinent part a "firearm" as "[a]ny weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device. . ."

81.    As I explain above, the unfinished blank is not a weapon. And it may not be "readily converted" to a weapon. It is not a "receiver" under the definition set forth for a receiver under 27 CFR 478.11.

82.    With respect to paragraph 2, R/A McCracken fails to explain his "familiarity" with the subject 5804 EP80 unfinished blanks. Although R/A McCracken states that the 5804 EP80 items are "firearms," he does not explain how he arrived at that conclusion, or his individual expertise in firearms sufficient to arrive at such a conclusion. The Court should not assume that simply because an Agent is employed by the ATF that such Agent has any particular expertise in making a determination that a specific item is or is not a firearm. Indeed, during my tenure with the ATF, new Agents only spent three and a half days studying firearms at the academy. Myself and other instructors at the ATF Academy

1   voiced our concerns to the ATF directorship repeatedly regarding this lack of

2   training.

3       83.    While on detail at the U.S. Military Academy at West Point, myself

4   and at least five other ATF Agents and Headquarters personnel drafted a program

5   which would provide the ability for ATF Agents to become proficient in firearms

6   beyond the basic 3.5 days of instruction provided during basic training. This

7   course would have parraleled the existing courses for specializing in Explosives

8   or Arson which are known as the Certified Explosive Specialist and the Certified

9   Fire Investigator programs respectively.

10      84.    There is no course offered in ATF which provides the ability for an

11  Agent to become a Specialist in Firearms, although firearm investigations

12  comprise over 90% of ATF's caseload.

13      85.    Upon completing the draft for this proposed program, it was

14  submitted to ATF Headquarters, however it has never been instituted nor funded.

15      86.    In 1998, I, along with several other ATF Agents who have firearm

16  expertise, were tasked with re-writing the basic course of instruction on firearm

17  technology for the ATD Academy's basic Agent curriculum. The resulting course

18  of study on firearm technology for ATF trainee Agents was increased from its

19  prior two-day length, to 6 days in length.

20      87.    That course of study would have provided trainee ATF agents a

21  sufficient background in firearms technology such that they would be able to

22  reasonably explain the attributes of a firearm as it relates to their duties to enforce

23  Title 18 of the U.S. Code. However, when the proposed 6-day course was

24  submitted to the Headquarters Training Directorate, we on the Academy Staff

25  were ordered to shorten it to 3.5 days.

26      88.    Further, while a commercial manufacturer of a "firearm" is required

27  to affix a serial number, there is no such requirement for a person who is not

28  engaged in the business of manufacturing, i.e., a hobbyist building for themselves

to serialize their completed firearm.  Nor is there any requirement that a manufacturer of an item that is a blank or an unfinished receiver affix a serial number to a firearm.

89.     Thus R/A McCracken's conclusions regarding the nature of the 5804 blanks is simply without factual basis, and incorrect.

## DECLARATION OF SPECIAL AGENT MARKS

90.     I have reviewed the undated Declaration of Special Agent Marks ("S/A Marks"), filed in this case on September 22, 2014, which in pertinent part states:

* * *

2. On or before 2/13/14, ATF FTB determined that the EP80 lower receiver manufactured by EP Armory was a firearm as defined by 18 USC 921(a)(3).
3. Firearms manufactured for sale require, by federal law, manufacturing marks and a serial number.
4. The EP80 lower receiver does not have manufacturing marks or a serial number.
5. Ares Armor offered the EP80 lower receiver for sale on the internet and in their stores.
6. The EP80 lower receiver is commonly used to make AR-15 style rifles. The AR-15 is the semiautomatic, civilian version of the .223-caliber M16 machine gun used by the United States military. The AR-15 is comprised of many parts, including the (1) lower receiver, (2) upper receiver, (3) stock, (4) barrel, and (5) magazine. It can also be made into a pistol, however, this is much less common.
7. On 3/13 and 3/14/14, the Federal Licensing System database was queried. The query revealed that no individual or entity/corporation associated with Ares Armor has a Federal Firearms License or has applied for a Federal Firearms License to deal firearms.

* * *

[Case 3:14-cv-01679-JLS-BGS Document 7-2 Filed 09/22/14 Page 2 of 2]

91.     S/A Marks, unlike R/A McCracken, seemingly relies on the ATF/FTB's determination that the 5804 unfinished receiver blanks seized from Lycurgan are "firearms."  As I have discussed above, I disagree with S/A Marks's conclusion for the reasons stated above.

92.     For the reasons stated above, the 5804 items seized from Lycurgan are not firearms.  The AR-15 is **not** "the semiautomatic, civilian version of the

.223-caliber M16 machine gun used by the United States military."   The AR-15 and the M-16 use different receivers.   The M-16 receiver has additional machining operations.   Specifically, the M-16 receiver utilizes an additional machining operation to drill a hole through both sides of the receiver in the appropriate location in order to accommodate the axle-pin on which the auto-sear pivots.   I.e., to drill what is euphemistically referred to in the gun industry as the "felony hole."

93.     There is no requirement that a person selling unfinished receiver blanks, such as Lycurgan Inc. d/b/a Ares Armor to obtain a Federal Firearms License.

94.     Finally, for the reasons stated above, the 5804 items are not contraband such that it is unlawful for Lycurgan Inc. to sell, distribute, transport or possess these blanks.

I declare under the penalty of perjury according to the laws of the United States that the foregoing is true and correct and that this declaration was signed on October 22, 2014.

_____

Daniel G. O'Kelly

1  .223-caliber M16 machine gun used by the United States military."  The AR-15

2  and the M-16 use different receivers.  The M-16 receiver has additional

3  machining operations.  Specifically, the M-16 receiver utilizes an additional

4  machining operation to drill a hole through both sides of the receiver in the

5  appropriate location in order to accommodate the axle-pin on which the auto-sear

6  pivots.  I.e., to drill what is euphemistically referred to in the gun industry as the

7  "felony hole."

8      93.    There is no requirement that a person selling unfinished receiver

9  blanks, such as Lycurgan Inc. d/b/a Ares Armor to obtain a Federal Firearms

10  License.

11     94.    Finally, for the reasons stated above, the 5804 items are not

12  contraband such that it is unlawful for Lycurgan Inc. to sell, distribute, transport

13  or possess these blanks.

14      I declare under the penalty of perjury according to the laws of the United

15  States that the foregoing is true and correct and that this declaration was signed

16  on October 22, 2014.

17

18

19                                   Daniel G. O'Kelly

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# RESUME OF
# DANIEL G.  O'KELLY
### DIRECTOR
### INTERNATIONAL FIREARM SPECIALIST ACADEMY, INC.
#### GUNLEARN.com

#### FIREARM EXPERT/CONSULTANT

---

**PO Box 338**                                                  **(813) 422-4674 work**
**Lake Dallas, Texas 75605**
**E-mail: Info@GunLearn.com**                    **(940) 498-2488 evening**
**10/21/2014**                                                              **Website:**
**www.GunLearn.com**

**EDUCATION:**

College:       -Valparaiso University, Valparaiso, Indiana
                   fall of 1974 through spring of 1975.
                   -Indiana University
                   fall of 1975 to January of 1981, Bachelor's degree.

**EXPERIENCE:**

 I have had over 34 years of full time experience as a Firearm Specialist, while serving as an ATF agent and Police Officer, Range Instructor, ammunition and firearm manufacturer/builder, dealer, and collector. I have examined well over 100,000 firearms and even more pieces of ammunition. I've been involved in numerous investigations concerning them, and I have testified in criminal & civil cases in State, Superior, Circuit, District and Federal Courts. I have also given numerous depositions in criminal and civil cases. As an ATF Agent, I was the commonly preferred Agent of the U.S Attorney's Office, for testimony on firearm matters. I continue to serve as a firearm examiner, consultant and trainer.

**WORK EXPERIENCE:**

11/11 to Present:        **DIRECTOR & CONSULTANT**
                                  International Firearm Specialist Academy
                                  Denton, Texas

Self-employed consultant with a staff of consultants, specializing in firearms and forensics-related services for law enforcement, the legal profession, the firearm industry, and the insurance industry.

Resume of Daniel G. O'Kelly
October 21, 2014   Page 2

Clients include civil Attorneys, prosecution and defense Attorneys, law enforcement agencies and individual law enforcement personnel, licensed firearm dealers, manufacturers, importers and collectors.

Services offered include firearm and ammunition identification, certification as an accredited Firearm Specialist, training seminars on firearm technology, subject-matter expert court testimony, shooting scene reconstruction, shooting accident investigations & reconstructions, gun safety & design-related consultations, ATF compliance consultation and examinations/audits, armorer schools, range instruction, tool mark examinations, crime scene examinations & reconstruction, general criminalistics related examinations, gunshot residues issues, distance determination examinations, forensic pathology casework consultations, etc.

11/11 to 12/13:          **CORPORATE SENIOR MANAGER**
                         **FIREARM COMPLIANCE TEAM**
                                Cabela's, Inc.
                                Sidney, Nebraska

I was responsible for the auditing and inspection of the firearm departments of the company's 50 stores. This was in order to ensure and maintain ATF compliance, for one of the world's largest firearm retailers.  I also co-wrote and delivered their training program to hundreds of employees on firearm ID, ATF compliance, Ammunition, the Gun Control Act and the National Firearms Act.

09-88 to 11/11:        **ATF SENIOR SPECIAL AGENT**
                         Chicago, IL National Academy, and Tampa, FL

Duties included investigations of violations of the federal gun laws and explosives laws, bombings, arsons and undercover investigations of organized crime. Further, it included;
- Firearm interstate nexus determinations
- Firearm technology determinations
- Court testimony (several hundred times at last count)
- The training of ATF Agents and Investigators and other law enforcement personnel on all aspects of firearms. Firearm identification, Ammunition casing, bullet and cartridge identification
- Firearm Interstate Nexus determinations for U.S. District Court
- NFA firearm examinations/determinations
- Oversight of all Division Range Instructors
- Maintenance of the firearm training budget, maintenance of over 800 firearms in inventory and maintenance of over 50,000 rounds of ammunition
-Assisting U.S. Attorneys and other Agents in firearm and ballistics related determinations
- Teaching seminars statewide, to thousands of police, legal, medical, and other personnel, on firearm and ammunition- related topics.

Resume of Daniel G. O'Kelly
October 21, 2014   Page 3

- Made determinations as to whether an item is a non-gun vs. a firearm, according to Title 18 and Title 26, U.S. Code
- Performed function checks on firearms as to their ability to fire
- Served as the Armorer/repairman for all duty-issued firearms


01-96 to 03/01   **ATF SENIOR SPECIAL AGENT/ PROGRAM MANAGER**
ATF National Academy
Glynco, Georgia

During this tenure, I was the Chief Firearm Technology Instructor at the ATF National Academy, where I wrote and co-wrote the entire firearm technology course of study that is still taught to new Agents and compliance Investigators. I also instructed courses for U.S. Customs on firearm importation. I also was custodian of the firearm reference vault which contained over 800 firearms, including numerous NFA firearms. It was my duty to maintain, repair and have a teaching-level familiarity with the operation of all of them.

I also became certified by ATF as an Interviewing (Train-The Trainer) Instructor, and administered several Interviewing Schools around the U.S., as sponsored by the ATF National Academy. I also served as the Program Manager of ATF's Undercover School during 1998-99.


**Specialized Training:**
- Tour and research at HS Precision Rifles mfg. facility in Rapid City, SD, and Dakota Arms mfg. facility in Sturgis, SD – 2013
-Tour and research at Connecticut Shotgun in New Britain, CT., and Charter Arms in Sheldon, CT. - 2013
-Tour and research at STI Firearms mfg. facility in Austin, TX.- 2013
-Tour and research at North American Arms in UT. - 2013
-Tour and research at Patriot Ordnance Factory, Phoenix, AZ. – 2012
-Tour and research at Arms Tech Ltd. in Phoenix, AZ. - 2012
-Tour and research at Windham Weaponry in Windham, ME.- 2012
-Armorer training, Kimber Firearms, West Palm Beach, FL. - 2011
-Tour and research at the Bundesamt fur Wehrtechnick und Beschaffung (BWB) (Federal Office of Defense Technology and Procurement) in Koblenz, Germany. - 2010
-Armorer training, DS Arms (FAL), Springfield Armory (XD), and Smith & Wesson (M&P), San Antonio, TX. - 2010
-Tour and research at Kel-Tec CNC Industries, Cocoa Beach, FL. –

3

Resume of Daniel G. O'Kelly
October 21, 2014   Page 4

2009
- Tour and research at Diamondback Arms, Titusville, FL. - 2009
- Tour and research at the German Police (BKA) firearm technology
  reference collection, Wiesbaden, Germany - 2005
- Tour and research at Vektor Firearms factory, and the New
  Generation Ammunition Factory, Pretoria, South Africa. - 2004
- Remington Armorer School (870, 1187 and 700), Cape
  Girardeau, Missouri. - 2003
- Tour and research at MFS ammunition factory, Sirok, Hungary. –
  2003
- International Association of Law Enforcement Firearm Instructors
  (IALEFI)  annual training conference, Orlando, Florida. - 2003
- Tour and research at Sellier & Bellot ammunition factory,
  Vlasim, Czech Republic. – 2003
- Tour and research at the U.S. Military Academy firearm museum
  at West Point, NY. - 2003
- Firearm Instructor Recertification/Enhancement Workshop, ATF
  Special Operations Division, Orlando, Florida. - 2002
- Colt Armorer school (AR-15/M-16/M-4 series), (Model O pistols),
  Fairfax, Virginia. - 2002
- Beretta Armorer school (model 92/96), San Diego, California. –
  2002
- Fabrique Nationale Herstal (FNH) Armorer school (P90) San
  Diego, California. - 2002
- Tour and research at Pretoria Metal Pressings (PMP) ammunition
  factory, Pretoria, South Africa. - 2002
- Tour and research at Vektor firearm mfg., Pretoria, South Africa.-
  2002
- IALEFI Training Conference, San Diego - 2002
- Tour and research at Fegarmy firearm factory (2nd tour), Budapest,
  Hungary. -2001
- Tour and research at the Hungarian Police Laboratory firearm
  reference collection, Budapest, Hungary. -2001
- Tour and research at Ceska Zbrojovka (CZ) firearm factory (my
  2nd tour) and the Czech government Proof House, Uhersky-Brod,
  Czech Republic. – 2001
- Tour and research at Glock firearm factory (my 2nd tour), Deutsch-
  Wagram, Austria. -2001
- Tour and research at the Vienna proof house in Deutsch- Wagram,
  Austria. – 2001
- Tour and research at Carl Walther firearm factory (my 2nd tour),
  Ulm, Germany. - 2001
- Tour and research at the government proof house, Ulm, Germany.

4

Resume of Daniel G. O'Kelly
October 21, 2014   Page 5

      – 2001
- Tour and research at Heckler & Koch firearms (my 2nd tour), Oberndorf, Germany. -2001
- Tour and research at Sig-Sauer firearms (my 2nd tour), Eckernforde, Germany. – 2001
- Tour and research at the Kiel proof house, Eckernforde, Germany. – 2001
- Tour and research at the Fabrique Nationale (FN) firearm Factory, Liege, Belgium. -2001
- Tour and research at the government proof house, Liege, Belgium. -2001
- Tour and research at the Austrian Police Headquarters Waffen Referat (Weapons Reference Collection), Vienna, Austria. – 2001
- Tour and research at the Heeresgeschichtlen (Military History) Museum, Vienna, Austria. - 2001
- ATF Youth Crime-Gun Interdiction Initiative Instructor school, Washington, D.C. - 2000
- Tour and research (my 2nd tour) at the Heeresgeschichtlichen (Military History) Museum, Vienna, Austria. - 1999
- ATF Advanced Firearm Interstate Nexus course on ammunition manufacturing. Included tours and research at Hornady in Grand Island, Nebraska, 3D in Doniphan, Nebraska, Lake City Army Ammunition Depot in Independence, Missouri, Starline Brass and Sierra Bullets in Sedalia, Missouri, and the Winchester-Olin ammunition plant in East Alton, Illinois.- 1999
- ATF Advanced Firearm Interstate Nexus course on firearm manufacturing. Included tours and research at Sturm-Ruger (my 2nd tour) and Pine Tree Castings in New Hampshire, Smith & Wesson and Springfield Armory in Massachusetts, and Colt and Mossberg in Connecticut. – 1998
- Sturm-Ruger Armorer course (Mini-14, Police Carbine, P89, P95) Newport, New Hampshire. – 1997
- Tour and research at Sturm-Ruger firearm factory, Newport, New Hampshire. - 1997
- Tour and research at Pine Tree (firearm) Castings facility, Newport, New Hampshire. - 1997
- Tour and research at Ceska Zbrojovka (CZ) firearm factory in Uhersky-Brod, Czech Republic. - 1997
- Tour and research at Steyr firearm mfg. plant, Steyr,  Austria.- 1997
- Tour and research at the Fegarmy' firearm mfg. plant, Budapest, Hungary. – 1997
- Tour and research at Glock pistol mfg. plant, Deutsch- Wagram,

5

Resume of Daniel G. O'Kelly
October 21, 2014   Page 6

Austria. 1997
- Heckler & Koch Armorer, Sterling, Virginia. - 1996
- Sig-Sauer Armorer course (P225, P226, P228) Fort McClellan, Alabama. – 1996
- Reid Interviewing Seminar – 1996
- ATF Interviewing Instructor and Neuro-Linguistic Programming School - 1996
- SIMUNITIONS Scenario-Based (Train the Trainer) Seminar - 1996
- Tour and research at Sig-Sauer mfg plant, Eckernforde, Germany, - 1995
- Tour and research at Carl Walther firearm mfg. plant, Ulm, Germany, where I consulted on development of the model P99 pistol. - 1995
- ATF Advanced Arson and Explosives Investigation School – 1995
- Violent Crime/Homicide Investigation School (USDOJ) - 1994
- Tour and research at the Ministry of Defense, Pattern Room, Nottingham, England.  – 1994
- Tour and research at Holland & Holland, Ltd., firearms London, England. - 1994
- Bureau of ATF Academy Instructor Certification - 1994
- Glock Armorer Course, Springfield, Illinois. - 1993
- Advanced Interviewing and Interrogation (Portage PD)- 1992
- Sig-Sauer Armorer Course, Greenwood, Indiana. - 1990
- FLETC Distinguished Weapons Expert Certification - 1990
- ATF Basic Firearm Interstate Nexus course, Washington D.C., (included examination of over 4,500 firearms) - 1990
- Firearm Instructor certification course at the Federal Law Enforcement Training Center, Marana, AZ. – 1990
- New Agent Training at the FLETC, Glynco, Georgia. – 1988
- Criminal Investigator School, at the FLETC,  – 1988
- Smith & Wesson Revolver Armorer Course, Kent State U. -1987
- Smith & Wesson's Scope -Sighted Rifle School - 1987
- Indiana L.E. Training Board, Instructor Certification - 1987
- Aerko International Chemical Weapons Specialist School, Camp Atterbury, Indiana. – 1987
- NRA Police Firearms Instructor Certification - 1985
- Firearm Instructor Training Course at the Indiana Law Enforcement Academy, Plainfield, IN. - 1982
- Chemical Tests for Intoxication Certification (ILEA) - 1979
- Police Officer Certification, Indiana Law Enforcement Academy, Plainfield, Indiana. – 1979
- NRA Police Expert (Range Qualification) - 1978

6

Resume of Daniel G. O'Kelly
October 21, 2014   Page 7

**PROFESSIONAL AFFILIATIONS**
          The National Shooting Sports Foundation
          ARIN (ATF's Ammunition Research and Identification Network)
          The International Ammunition Association
          The National Defense Industrial Association
          The International Association of Law Enforcement Firearm Instructors
          The National Rifle Association
          Property an Evidence Association of Florida
          Florida Division- International Association of Identification

**PRESENTATIONS**
1. <u>Advanced Firearm Technology</u> – Institute of Military Technology – Titusville, FL. 10/12
2. <u>Firearm Recognition/Handling/Testimony</u> – Orange County Sheriff's Office – Orlando, 7/5/12
3. <u>Firearm Recognition/Handling/Testimony</u> – Florida Dept. of Law Enf. – Orlando, 6/4/12
4. <u>Firearm ID – How to Read a Gun</u> – Florida Assn. of Licensed Investigators – Tampa, FL, 6/11/11
5. <u>Firearm History and Development – A primer On Becoming an Expert</u> – West Palm Bch, FL, 5/26/11
6. Contributor to the book **Cartridges & Firearms Identification** by Robert Walker, ISBN #9781466502062 – 2010
7. <u>Firearm Technology and Enforcement</u> – Int'l Law Enforcement Academy – Budapest, Hungary, 7/10
8. <u>Crime-Gun Safety, Recognition and Handling</u> – Daytona Beach Police Department, 09/09
9. <u>Crime-Gun Safety, Recognition and Handling</u> – Brevard County, FL Sheriff's Office, 06/09
10. <u>Ammunition Technology</u> – Property and Evidence Association of Florida, Orlando, 02/09
11. <u>Firearm Interstate Nexus</u> – ATF and South African Police Service - Orlando, FL, 01/09
12. <u>Industry Operations Investigator Basic Course</u> – Glynco, GA, 10/07
13. <u>Firearm Technology and Enforcement</u> – Gabarone, Botswana (Africa), 08/07
14. <u>Small Arms Trafficking</u> – ILEA – Gabarone, Botswana (Africa), 08/07
15. <u>Firearm Recognition, Technology and Anti-Smuggling</u> – ILEA Budapest, Hungary, 12/08
16. <u>Firearm Recognition/Technology</u> – Orange County Sheriff Orlando, FL 08/08
17. <u>Crime-Gun Recognition, Handling Technology and Prosecution</u> – FDIAI – Panama City, FL, 11/05
18. <u>Reloading Metallic Cartridges</u> - Florida Dept. Of Law Enforcement – Tampa, FL 03/08
19. <u>New Developments in Ammunition</u> – FDLE Orlando, FL, 10/04
20. <u>Firearm Technology and Enforcement</u> – Gabarone, Botswana (Africa), 09/04
21. <u>Small Arms Trafficking</u> – ILEA – Gabarone, Botswana (Africa),
22. <u>Man Portable Air Defense Systems</u> – Florida Intelligence Unit – Daytona Bch, FL 07/04
23. <u>Reloading Metallic Cartridges</u> - Florida Dept. Of Law Enforcement – Tampa, FL, 08/03
24. <u>Firearm Recognition, Technology and Anti-Smuggling</u> – ILEA Budapest, Hungary, 06/03

Resume of Daniel G. O'Kelly
October 21, 2014   Page 8

    25. <u>Firearm Technology and Enforcement</u> – Gabarone, Botswana (Africa), 08/02
    26. <u>Firearm Recognition, Technology and Anti-Smuggling</u> – ILEA Budapest, Hungary, 02/97
    27. <u>Firearm Technology For Law Enforcement</u> Gary, IN, 12/95

**AWARDS & ACHIEVEMENTS**

Fraternal Order of Police (Past-President) Westchester Lodge #152 - 1980
Presented Distinguished Weapons Expert Award by FLETC - 1990
Presented Special Act or Service Award by ATF - 1993
Presented U.S. DOJ Award for Public Service by U.S Attorneys Office - 1995
Presented Special Act or Service Award by ATF - 1999
Presented Special Act or Service Award by ATF - 2000
Presented Certificate of Appreciation by ATF National Academy – 2001
Presented Special Act or Service Award by ATF - 2002
Presented Award for Educational Support by PEAF - 2005
Invited to join ATF's ARIN (Ammunition Research & ID Network) – 2005
Featured Speaker- "<u>Firearm Technology</u>"- Property and Evidence Association of
Florida Annual Conference - 2006
Research of ammunition company history determination that there is an interstate
nexus, concerning any complete metallic cartridge found in the State of Florida.-
2009
Presented IALEFI Guest Instructor Award - 2010

Exhibit 'A'



*The Law Offices of*
# DAVIS & ASSOCIATES

27201 Puerta Real, Suite 300, Mission Viejo, CA 92691
Direct (949) 310-0817/Fax (949) 288-6894 Jason@CalGunLawyers.com
www.CalGunLawyers.com

July 20, 2013

Earl Griffith
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Firearms Technology Branch
244 Needy Road
Martinsburg, West Virginia 25405 USA
**VIA FED-EX**

Re: **In re: EP ARMS, LLC**

Dear Mr. Griffith:

I write regarding my client, EP ARMS, LLC (EPA) and their intent to manufacture a partial lower receiver. Specifically, we are asking for clarification as to whether the incomplete AR-type lower that my client intends to manufacture is a "firearm" as defined in 18 U.S.C. §921(a)(3) or a merely a casting.

We have enclosed an exemplar EPA AR-15 type casting for your review and examination. The following features are included on the AR-15 casting:

- Magazine well;
- Magazine catch;
- Receiver extension/buffer tube;
- Pistol-grip area;
- Pistol-grip screw hole;
- Pistol-grip upper receiver tension hole;
- Pistol-grip tension screw hole;
- Bolt catch;
- Front pivot-pin takedown hole;
- Rear-pivot pin takedown hole.

We believe that these features molded into the raw casting do not render the casting a firearm for the reasons detailed below. But, in an abundance of caution, we request clarification from the Bureau of Alcohol, Tobacco, Firearms, and Explosives – Firearms Technology Branch.

Case 3:14-cv-00545-GLS-DEP Document 55-0 Filed 09/22/14 Page 3 of 6

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:     **In re: EP ARMS, LLC**
July 20, 2013
Page 2

# DEFINITION OF FIREARM

Title I of the Gun Control Act, 18 U.S.C. §§ 921 *et seq.*, primarily regulates conventional firearms (i.e., rifles, pistols, and shotguns). Title II of the Gun Control Act, also known as the National Firearms Act, 26 U.S.C. §§ 5801 *et seq.*, stringently regulates machine guns, short barreled shotguns, and other narrow classes of firearms. "Firearm" is defined in § 921(a)(3) as:

> (B) Any weapon (including a starter gun) which will or is designed to or may readily be converted expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

As noted, the term "firearm" means a "weapon . . . which will or is designed to or may readily be converted to expel a projectile," and also "the *frame or receiver* of any such weapon." (18 U.S.C. §921(a)(3).) Both the "designed" definition and the "may readily be converted" definition apply to a weapon that expels a projectile, not to a frame or receiver. A frame or receiver is not a "weapon," will not and is not designed to expel a projectile, and may not readily be converted to expel a projectile.

The issue therefore becomes whether the raw material "casting," with the specified features, may constitute a "frame or receiver."

ATF's regulatory definition, 27 C.F.R. §478.11, provides: "*Firearm frame or receiver.* That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel. (The same definition appears in 27 C.F.R. §479.11.) "Breechblock" is defined as the locking and cartridge head supporting mechanism of a firearm that does not operate in line with the axis of the bore." (*Glossary of the Association of Firearms and Toolmark Examiners* (2nd Ed. 1985, 21).)

Assuming that a lower receiver is deemed a "frame or receiver" for licensing purposes, the statute refers to "the frame or receiver of any such weapon," not raw material which would require further milling, drilling, and other fabrication to be usable as a frame or receiver. Referring to ATF's definition in §478.11, an unfinished piece of metal is not a "part" that "provides housing" (in the present tense) for the hammer, bolt, or breechblock, and other components of the firing mechanism, unless and until it is machined to accept these components. The definition does not include raw materials that "would provide housing" for such components ". . . if further machined." Nor may it be said that such piece of metal "is . . . threaded at its forward portion" so that a barrel may be installed.

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:      **In re: EP ARMS, LLC**
July 20, 2013
Page 3

In ordinary nomenclature, the frame or receiver is a finished part which is capable of being assembled with other parts to put together a firearm." (*Receiver.* The basic unit of a firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled. *Glossary of the Association of Firearm and Toolmark Examiners* (2nd ed. 1985), 111.) Raw material requires further fabrication. The Gun Control Act recognizes the distinction between "Assembly and "fabrication." (Compare 18 U.S.C. §921(a)(29) (defining "handgun" in part as "any combination of parts from which a firearm described in subparagraph (A) can be *assembled*") with §921(a)(24) (referring to "any combination of parts, designed or redesigned, and intended for use in *assembling or fabricating* a firearm silencer or firearm muffler" (emphasis added.).) The term "assemble" means "to fit or join together (the parts of something, such as a machine): to assemble the parts of a kit". (Assemble. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition.* HarperCollins Publishers. http://dictionary.reference.com/browse/assemble (accessed: January 23, 2013).) The term "fabricate" is broader, as it also synonymous with manufacture: "to make, build, or construct." (Fabricate. *Dictionary.com. Collins English Dictionary - Complete & Unabridged 10th Edition.* HarperCollins Publishers. http://dictionary.reference.com/ browse/fabricate (accessed: January 23, 2013).) Thus, drilling, milling, and other machining would constitute fabrication, but assembly more narrowly means putting together parts already fabricated.

Moreover, "Congress did not distinguish between *receivers integrated into an operable weapon and receivers sitting in a box, awaiting installation*." (*F.J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448, 450 (D.C. Cir. 1994)(Emphasis added.) The absence of a single hole and the presence of a piece of extra metal may mean that an item is not a frame or receiver." (*Id.* at 452 ("In the case of the modified HK receiver, the critical features were the lack of the attachment block and the presence of a hole"; "welding the attachment block back onto the magazine and filling the hole it had drilled" removed the item from being a machinegun receiver.).)

## ANALOGOUS DETERMINATIONS

In an analogous situation, ATF has defined a receiver in terms of whether it was "capable of accepting all parts" necessary for firing. Like the term "firearm," the term "machinegun" is also defined to include the "frame or receiver of any such weapon." (26 U.S.C. §5845(b). The same definition is incorporated by reference in 18 U.S.C. §921(a)(3).) The Chief of the ATF Firearms Technology Branch wrote in 1978 concerning a semiautomatic receiver which was milled out to accept a full automatic sear, but the automatic sear hole was not drilled. He opined: "in such a condition, the receiver is not capable of accepting all parts normally necessary for full automatic fire. Therefore, such a receiver is not a machinegun. . . . As soon as the receiver is capable of accepting all parts necessary for full automatic fire, it would be subject to all the provisions of the NFA." (Nick Voinovich, Chief, ATF Firearms Technology Branch, Feb. 13, 1978, T:T:F:CHB, 7540. Similar opinions were rendered by the Chief, ATF Firearms Technology

Case 3:14-cv-00548-JLS-BGS Document 83-5 Filed 09/22/14 Page 5 of 6

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:     **In re: EP ARMS, LLC**
July 20, 2013
Page 4

Branch, Aug. 3 1977 (reference number deleted); and C. Michael Hoffman, Assistant Director (Technical and Scientific Services), May 5, 1978, T:T:F:CHB, 1549?).)

That being said, the ATF has taken differing opinions as to what extent raw material must be machined in order to be deemed a firearm.

In a 2002 determination, ATF stated the following about an unfinished lower receiver for an AR 15 that "by performing minor work with hand tools, this receiver can be assembled into a complete rifle." (Curtis H.A. Bartlett, Chief, Firearms Technology Branch, Oct. 22, 2002, 903050:RV.) The letter continues:

> The minor work includes:
> 1. Drilling the holes for the takedown/assembly pins;
> 2. Drilling the holes for the trigger and hammer pins;
> 3. Drilling the holes for the magazine catch; and
> 4. Drill and tap the holes for the pistol grip screw.
>    Our evaluation reveals that the submitted receiver can be readily converted to expel a projectile by the action of an explosive," and is, therefore, a firearm . . . .

The above assumes that the "can be readily converted" clause refers to a frame or receiver, when actually that clause refers to a *weapon* that can be so converted. A frame or receiver cannot, by itself, be converted to a weapon that expels a projectile. That would require the presence of all the other firearm parts, and even then the above machine work would be required, together with assembly.

By contrast, and more recently, ATF determined the following "unfinished AR15 lower" not to be sufficiently machined to constitute a frame or receiver:

> The FTB examination of your submission confirmed that machining operations have been performed for the following:
>
> - Magazine well;
> - Magazine catch;
> - Receiver extension / buffer tube;
> - Pistol grip;
> - Bolt catch;
> - Trigger guard;
> - Pivot pin and take down holes (drilled).

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:   **In re: EP ARMS, LLC**
July 20, 2013
Page 5


The FTB examination found that this item, in its current condition, has not reached a point in manufacturing to be classified as a "firearm" per the GCA definition, Section 921(a)(3).

(John R. Spencer, Chief, Firearms Technology Branch, November 19, 2012, 903050:MRC 3311/2012-1034.) (See also: 903050:AG 3311/2011-703; 903050:KB 3311/300863; 903050:KB3311/300862)

It is important to note that each side of the submitted casting includes three extrusions. As you are aware, these extrusions do not exist on completed AR-15 type lowers. They have been added to the component and must be removed prior to installation of any parts or components. While these extrusions do contain slight depressions, these depressions are not of sufficient depth to cross the plane of the either side of the completely machined lower receiver.

It is clear that the EPA casting does not provide housing for the "hammer, bolt or breechblock, and firing mechanism." In this regard, the operations performed on the exemplar casting are more akin to the later examination than the former. As such, it is our belief that the exemplar casting does not constitute a "receiver" or a "firearm." But, again, we request your clarification on this point.

Thank you for taking the time to address this issue. We look forward to hearing from you. Please let us know if you have any further questions or concerns.


Sincerely,

**DAVIS & ASSOCIATES**

s/ *Jason Davis*

JASON DAVIS

Exhibit 'B'



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg, WV 25405_

www.atf.gov

903050:MRC
3311/301179

February 7, 2014

Mr. Jason Davis
Davis & Associates
27201 Puerta Real
Suite 300
Mission Viejo, CA 92691

Dear Mr. Davis,

This is in reference to your correspondence, along with an AR-15 type "incomplete lower," to the Firearms Technology Branch (FTB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). You have submitted this casting on behalf of your client, EP Arms, for classification under the Gun Control Act of 1968 (GCA).

As you are aware, the GCA, 18 U.S.C. § 921(a)(3), defines the term **"firearm"** as follows: ..._(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm._ Further, GCA implementing regulations, 27 CFR § 478.11 define "firearm frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

The FTB examination of this casting confirmed that it has the following features and characteristics:

1. Magazine well.
2. Magazine catch.
3. Bolt catch.
4. Pistol grip.
5. Forming and tapping for receiver-extension/buffer tube.
6. Front pivot-pin hole.

Mr. Jason Davis                                                    Page 2

7. Rear take-down hole.
8. Holes drilled for the detent take-down and pivot pin, retainer buffer, detent fire-control selector, and pistol-grip screw.

Further examination by FTB revealed that excess material extends past the exterior walls of the casting, indicating the approximate locations of the holes to be drilled for the selector, hammer, and trigger pins. We further noted that the fire-control cavity has been formed and then, at a later time, filled in with plastic material.

It is our determination that when the fire-control cavity was formed during the manufacturing process, the submitted casting reached a point in its manufacture to be classified as a "firearm" as defined in 18 U.S.C. 921(a)(3).

You argue that to be classified as a "firearm frame or receiver," the GCA and implementing regulations require that the item be completed so that all fire control components may presently be installed in the frame or receiver. In interpreting the GCA and implementing regulations as applied to AR-type firearms, ATF has long held that any machining of the fire-control cavity is the legally significant step in making a receiver.

Further, the filling of the cavity at a later point does not change our classification. Although the fire-control cavity was filled with plastic material that must be removed before fire control components may be installed, ATF has long held that this is not sufficient to destroy the receiver and remove the item from classification as a "frame or receiver." For your reference we have included the destruction diagram for AR-type firearms.

Finally, although the definition of "machinegun" includes "frame or receiver," determination of what constitutes a machinegun receiver often requires a different analysis than determining whether something is a firearm under the GCA. In some cases, machineguns are made from semiautomatic firearms with extra components, and it is the modification of a receiver to accept these extra components that creates the machinegun receiver. Although FTB has determined that a semiautomatic receiver was not made into a machinegun receiver "until the receiver is capable of accepting all parts necessary for full automatic fire," that reasoning doesn't apply to making a determination of whether the item is a firearm under the GCA. This is because classifying a semiautomatic receiver as a machinegun simply because it may be machined to accept machinegun parts would regulate all such firearms as "machineguns." Therefore ATF's classifications of machinegun receivers is not premised on the fact that the receiver must be capable of housing all parts necessary for automatic fire, but that a semiautomatic copy of a machinegun becomes a machinegun only when this occurs. See Sendra Corp. v. Magaw, 111 F.3d 162, 163 (D.C. Cir. 1997).

In closing, we caution that the information found in this correspondence with regard to the evaluation described above is intended only for use by the addressed recipient(s).

Please provide our Branch with a FedEx account number or a UPS shipping label addressed to yourself so that we may return your sample. Please be advised that we do

Mr. Jason Davis                                              Page 3

not ship via the U.S. Postal Service. If you don't need to have us return your sample, you
may fax FTB at 304-616-4301 with authorization to destroy it on your behalf.

We thank you for your inquiry and sample, regret that our findings could not be more
positive, but trust the foregoing has been responsive to your request. If you require
further information concerning our findings, we can be contacted at any time.

Sincerely yours,

Earl Griffith
Chief, Firearms Technology Branch

Exhibit 'C'



*The Law Offices of*
# DAVIS & ASSOCIATES

27201 Puerta Real, Suite 300, Mission Viejo, CA 92691
Direct (949) 310-0817/Fax (949) 288-6894 Jason@CalGunLawyers.com
www.CalGunLawyers.com

March 4, 2014

Earl Griffith
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Firearms Technology Branch
244 Needy Road
Martinsburg, West Virginia 25405 USA
**VIA FED-EX**

Re: **In re: EP ARMS, LLC**

Dear Mr. Griffith:

I write regarding my client, EP ARMS, LLC (EPA). Specifically, we write to request reconsideration of your conclusion that the product sample submitted is a "firearm" in the response to your letter dated, February 7, 2014, which was based on a fundamental misunderstanding of the manufacturing process. (Enclosed.)

Specifically, your letter was a response to our letter dated July 30, 2013 (enclosed), which requested clarification as to whether a product submitted is a firearm. In your letter you stated that:

> It is our determination that when the *fire-control cavity was formed during the manufacturing process*, the submitting casting reached a point in its manufacturer to be classified as a "firearm" as a defined in 18 U.S.C. 921(a)(3).
> \*\*\*
> Further, the filling of the cavity at a later point does not change our classification. *Although the fire-control cavity was filled with plastic material that must be removed before fire control components may be installed*, ATF has long held that this is not sufficient to destroy the receiver and remove the item from classification as a "frame or receiver." . . .

(Emphasis added.)

As stated above, this response is based on a fundamental misunderstanding of the process by which the submitted sample is manufactured. Specifically, the letter is based on the assumption

*The Law Offices of*
**DAVIS & ASSOCIATES**

Re:     **In re: EP ARMS, LLC**
March 4, 2014
Page 2

that the receiver is formed, and then it is filled with additional plastic. This is inaccurate. **At no time is a fire-control cavity formed during the manufacturing process, nor is the fire-control cavity "filled" with plastic material. In fact, at no time does a fire-control cavity exist in the manufacturing process.**

The actual process of manufacturing the sample is the converse of your assumed method, and takes place in two stages:

**Stage 1:**
The manufacturing process starts with the production of a core, dubbed a "biscuit." (Enclosed with this letter are two sample core "biscuits" for your examination and evaluation.) It is made of a material close to Nylon 66 and is the first part of the manufacturing process. Once the biscuit is manufactured it has a 2 day curing process before proceeding to Stage 2.

**Stage 2:**
After the curing has taken place with the biscuit it is placed inside the cavity of a secondary mold. The secondary mold bonds additional material to the biscuit and creates the overall shape of the product by means of mold injection. (The previously submitted sample still in your possession represents the result of Stage 2 production). Thus, at no time does a fire-control cavity exist.

We believe that these features molded into the raw casting do not render the casting a firearm for the reasons detailed below. But, in an abundance of caution, we request clarification from the Bureau of Alcohol, Tobacco, Firearms, and Explosives – Firearms Technology Branch.
It is clear that the EPA casting does not provide housing for the "hammer, bolt or breechblock, and firing mechanism." In this regard, the operations performed on the exemplar casting are more akin to the later examination than the former. As such, it is our belief that the exemplar casting does not constitute a "receiver" or a "firearm." But, again, we request your clarification on this point.

Thank you for taking the time to address this issue. We look forward to hearing from you. Please let us know if you have any further questions or concerns. **When complete, please return the submitted parts via Fed-Ex using account number: 321690653.**

Sincerely,

**DAVIS & ASSOCIATES**

s/  *Jason Davis*

JASON DAVIS

# Exhibit 'D'

Case 3:14-cv-01679-JbS-KSC Document 12-3 Filed 10/28/14 PageID.834 Page 53 of 71
Case 8:10-cv-00548-GLS-DGS Document 58-6 Filed 09/22/14 Page 2 of 7
Case 1:14-cv-01211-JAM-SAB Document 1 Filed 07/31/14 Page 22 of 44



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg, WV 25405*

www.atf.gov

903050:MRC
3311/301179

Mr. Jason Davis
Davis & Associates
27201 Puerta Real
Suite 300
Mission Viejo, CA 92691

Dear Mr. Davis,

This is in reference to your letter dated March 4, 2014, requesting reconsideration of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) determination that the EP80 prototype submitted by EP Arms, LLC. (EP Arms) is classified as a "firearm receiver" under the Gun Control Act of 1968 (GCA). The basis for your request is your belief that ATF's assumptions concerning the manufacturing process for the EP80 were integral to our determination that the prototype constitutes a firearm for purposes of the GCA. That is not correct. To the extent ATF made assumptions about the manufacturing process, it was because details about that process were not provided with the July 30, 2013, request for classification. In any event, for the reasons articulated below, the details provided in your March 4, 2014, letter do not change our ultimate conclusion that the EP80 is a firearm receiver under the GCA.

As you are aware, the GCA, 18 U.S.C. § 921(a)(3), defines the term **"firearm"** as follows: ...*(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.* Further, GCA implementing regulations, 27 CFR § 478.11, define "firearm frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

Case 3:14-cv-01679-JDS-SCL Document 12-3 Filed 10/28/14 PageID.835 Page 54 of 71
Case 3:14-cv-00548-GLS-BGS Document 53-3 Filed 09/22/14 Page 3 of 71
Case 1:14-cv-01211-JAM-SAB Document 1 Filed 07/31/14 Page 23 of 44

Mr. Jason Davis                                                      Page 2

Our examination of this EP80 prototype submitted by EP Arms confirmed that it had the following features and characteristics:

1. Magazine well.
2. Magazine catch.
3. Bolt catch.
4. Pistol grip.
5. Forming and tapping for receiver-extension/buffer tube.
6. Front pivot-pin hole.
7. Rear take-down hole.
8. Holes drilled for the detent take-down and pivot pin, retainer buffer, detent fire-control selector and pistol-grip screw.

Further examination by the Firearms Technology Branch (FTB) revealed that excess material extended past the exterior walls of the casting, indicating the approximate locations of the holes to be drilled for the selector, hammer, and trigger pins.

In our initial classification this office included analysis of two separate and distinct issues. First, we advised that the EP Arms submission was a firearm receiver because the fire control cavity was created during the manufacturing process and was later filled with polymer—the item referred to in your appeal as the "biscuit." *In addition,* we noted that filling the fire control cavity with plastic was not sufficient to destroy the firearm.

You have not appealed this determination as being incorrect, but are appealing the determination that the EP80 receiver is a firearm because the manufacturing process differs from what is described in our determination letter. In your request for reconsideration, you describe that during the manufacturing process, the area comprising the fire control cavity is formed around a nylon core that you refer to as a "biscuit" and that at no stage in the manufacturing is the EP80 "back filled."

We previously advised that "the filling of the cavity at a later point does not change our classification....ATF has long held that this is not sufficient to destroy the receiver and remove the item from classification as a 'frame or receiver.'" We included this analysis to address any contention that inserting the biscuit would remove the item from classification as a firearm receiver.

However, based upon your newly supplied description of the EP Arms manufacturing process, we agree that this aspect of our analysis is not applicable to the EP80, as the biscuit is not meant to destroy the firearm. In fact, we understand that your contention is that this process prevents the item from reaching a stage of manufacture in which it may be classified as a "firearm receiver" claiming that "[a]t no time is a fire-control cavity formed during the manufacturing process....In fact; at no time does a fire-control cavity exist in the manufacturing process." We disagree.

The EP Arms manufacturing process represents a change from the processes by which AR-type firearms have historically been produced. ATF has long held that items such as receiver blanks–"castings" or "machined bodies" in which the fire-control cavity area is

Case 3:14-cv-01679-JLS-KSC Document 12-3 Filed 10/28/14 PageID.336 Page 55 of 71
Case 9:14-cv-00548-GLS-DCS Document 55-3 Filed 09/22/14 Page 4 of
Case 1:14-cv-01211-JAM-SAB Document 1 Filed 07/31/14 Page 24 of 44

Mr. Jason Davis                                                    Page 3

completely solid and un-machined – have not yet reached a "stage of manufacture" to be classified as a "firearm receiver." These items are a *single piece of metal* that require a substantial amount of machining to the vital areas of the firearm. In your request for reconsideration, you noted several letters in which FTB determined that certain submissions were not firearm receivers. However, in each of those examples the fire-control cavity was the same material as the receiver itself and the material filling the fire-control cavity is integral to the item; therefore the fire-control "cavity" had not been created.

To illustrate, photo 1 is a receiver "blank." This is not classified as a "firearm receiver" because the fire-control cavity has not been machined in any way. It is a single piece of metal from which a firearm receiver may be produced through further machining.



Location of the Fire Control Cavity



**Photo 1**

To further illustrate this difference between the EP Arms manufacturing process and traditional metal "castings" or "machined bodies," consider the following. Photo 2 is an AR-type receiver with a fully machined fire-control cavity. The red box outlines the cavity. This is classified as a firearm receiver pursuant to the GCA.



**Photo 2**

Case 3:14-cv-01679-JLS-KSC  Document 12-3  Filed 10/28/14  PageID.337  Page 56 of 71
Case 3:10-cv-00548-JLS-BGS  Document 83-3  Filed 09/22/14  Page 5 of 7
Case 1:14-cv-01211-JAM-SAB  Document 1  Filed 07/31/14  Page 25 of 44

Mr. Jason Davis                                                        Page 4

Photo 3 is an example of the EP Arms submission.  The "biscuit" is the white portion—
the exact size and dimensions of the functional fire-control cavity.  Notice that the biscuit
outlines the fire-control cavity as shown in photo 2.



**Photo 3**

Photo 4 is a side-view of the EP Arms design.  The top sample is made of clear plastic
and shows that the biscuit creates the internal dimensions of the fire-control cavity.



**Photo 4**

The photos illustrate that the EP Arms manufacturing process creates a fire-control cavity
through the use of a "biscuit."

Accordingly, based upon your description of the EP Arms manufacturing process, the EP
Arms submission is distinguishable from other "castings" or "blanks" that are not

Case 3:14-cv-01679-JLS-KSC Document 12-3 Filed 10/28/14 PageID.838 Page 57 of 71
Case 9:14-cv-00548-JLS-BGS Document 53-3 Filed 09/22/14 Page 6 of 81
Case 1:14-cv-01211-JAM-SAB Document 1 Filed 07/31/14 Page 26 of 44

Mr. Jason Davis                                                    Page 5

classified as firearms. Unlike "castings" or "blanks" which are formed as a single piece so that a fire-control cavity has not been made, EP Arms uses the biscuit specifically to create that fire-control cavity during the injection molding process. As described in your letter, it appears that the sole purpose of the "biscuit" is to differentiate the fire-control area from the rest of the receiver and thus facilitate the process of making the receiver into a functional firearm. ATF has long held that "indexing" of the fire-control area is sufficient to require classification as a firearm receiver. Based upon the EP Arms manufacturing process, it is clear that the "biscuit" serves to index the entire fire-control cavity. In fact, the biscuit is meant to differentiate the fire-control cavity from the rest of the firearm so that it may be easily identified and removed to create a functional firearm. See photo 5.



**Photo 5**

Therefore, the submitted sample is properly classified as a "firearm" as defined in 18 U.S.C. 921(a)(3) because the fire-control area is created during the manufacturing process through the use of the biscuit.

In addition to the formation of the fire-control cavity in the manufacturing process, your manufacturing process results in "excess material extending past the exterior walls of the casting, indicating the approximate locations of the holes to be drilled for the selector, hammer, and trigger pins." Based upon our previous understanding of the EP Arms manufacturing process, we did not analyze whether this excess material, on its own, would be sufficient to warrant classifying the EP80 as a firearm receiver. However, to remove any doubt about the correctness of our classification decision, we are including that analysis here.

The AR-15 platform is a two-part system generally comprised of a lower and an upper assembly. The lower assembly is classified as the receiver and a "firearm" because it provides the housing for the hammer and the firing mechanism, and contains mounting points for the upper assembly which accepts the barrel and houses the bolt or

Case 3:14-cv-01679-JLS-KSC Document 12-3 Filed 10/28/14 PageID.339 Page 58 of 71
Case 3:10-cv-00548-JLS-BGS Document 83-3 Filed 09/22/14 Page 7 of 71
Case 1:14-cv-01211-JAM-SAB Document 1 Filed 07/31/14 Page 27 of 44

Mr. Jason Davis                                                    Page 6

breechblock. As stated above, an AR-15 receiver blank is not classified by ATF as a
firearm. The point in the manufacturing process at which an AR-15 blank is classified as
a firearm is when it has been indexed for or machined in the fire-control recess area.
Such a receiver may also have had other machining performed, such as drilled pivot-pin
and takedown-pin hole(s). However, based upon your explanation of the manufacturing
process, this excess material indexing the location for the holes to be drilled is, by itself,
sufficient to classify the sample as a firearm receiver. See photo 6, below.



Indexing for the selector, hammer, and trigger pins

**Photo 6**

If you require further information concerning our findings, we can be contacted at any
time.

Sincerely yours,

Earl Griffith
Chief, Firearms Technology Branch

Exhibit 'G'

Case 3:14-cv-01679-JCS Document 12-3 Filed 10/23/14 Page 60 of 71
Case 3:14-cv-00548-JLS-BGS Document 85-1 Filed 09/29/14 Page 2 of 5
Case 1:14-cv-01211-JAM-SAB Document 1 Filed 07/31/14 Page 40 of 44



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_____

_Martinsburg, WV 25405_

www.atf.gov

903050: WJS
3311:300627

May 17, 2013

Mr. Doug Hughes
Operations Manager
Kenney Enterprises, Inc
4343 East Magnolia Street
Phoenix, AZ 85034

Dear Mr. Hughes,

This is in reference to your correspondence, with enclosed sample, to the Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB).
In your letter, you asked for a classification of the submitted, partially completed
AR-type receiver your company is planning to manufacture. Specifically, you wish to
know if this item would be classified as a "firearm" under the Gun Control Act of 1968
(GCA).

During the examination of your sample, FTB found that the following machining/drilling
operations performed on the submitted sample:

1. Front and rear assembly/pivot pin holes drilled.
2. Front and rear assembly/pivot detent pin holes drilled.
3. Selector-retainer hole drilled.
4. Magazine release and catch slots cut.
5. Trigger-guard holes drilled.
6. Rear of receiver drilled and threaded to accept buffer tube.
7. Buffer-retainer hole drilled.
8. Pistol-grip mounting area faced off, drilled, and threaded.
9. Magazine well completed.

The machining operations not yet performed are as follows:

1. Milling out of fire-control cavity.
2. Drilling of selector-lever hole.

Case 3:14-cv-01679-JCS-KSC Document 12-3 Filed 10/23/14 PageID.342 Page 61 of 71
Case 3:14-cv-00848-JLS-BGS Document 850-11 Filed 09/29/14 Page 3 of 51
Case 1:14-cv-01211-JAM-SAB Document 1 Filed 07/31/14 Page 41 of 44

Mr. Doug Hughes

    3.  Cutting of trigger slot.
    4.  Drilling of trigger pin hole.
    5.  Drilling of hammer pin hole.

The FTB examination of your submitted casting and diagrams found that your submitted item will not be sufficiently complete to be classified as the frame or receiver of a firearm and thus would <u>not</u> be a "firearm" as defined in the GCA.

In closing, we should point out that the information found in correspondence from our Branch is intended only for use by the addressed individual or company with regard to a specific scenario described within that correspondence.

To facilitate return of your sample, please provide FTB with the appropriate FedEx account information within 60 days of receipt of this letter.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request. Please do not hesitate to contact us if additional information is needed.

            Sincerely yours,

            Earl Griffith
    Chief, Firearms Technology Branch

Case 3:14-cv-00848-JLS-BGS Document 85-12 Filed 09/29/14 Page 2 of 3

Exhibit 'H'

Case 3:14-cv-01679-JGS-KSC Document 12-3 Filed 10/23/14 PageID.344 Page 63 of 71
Case 3:14-cv-00548-JLS-BGS Document 88-12 Filed 09/29/14 Page 2 of 53
Case 1:14-cv-01211-JAM-SAB Document 1 Filed 07/31/14 Page 37 of 44



U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg, WV 25405*

www.atf.gov

903050:WJS
3311/300833

July 15, 2013

Mr. Tilden Smith
80 Percent Arms
202 East Alton Avenue
Suite A
Santa Ana, CA 92707

Dear Mr. Smith,

This is in reference to your correspondence, with enclosed samples, to the Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB).
In your letter, you asked for a classification of the partially completed AR-type receivers
your company is planning to manufacture (see enclosed photos). Specifically, you want
to know if the three submitted items, identified as samples 1, 2, and 3 (and reviewed
below) would be classified as "firearms" under the Gun Control Act of 1968 (GCA).

SAMPLE #1

During the examination of this sample, FTB found that the following machining/drilling
operations had been performed:

1. Front and rear assembly/pivot pin holes drilled.
2. Front and rear assembly/pivot-detent pin holes drilled.
3. Magazine-release and catch slots cut.
4. Rear of receiver drilled and threaded to accept buffer tube.
5. Buffer-retainer hole drilled.
6. Pistol-grip mounting area faced off and threaded.
7. Magazine well completed.
8. Trigger guard machined.
9. Receiver end-plate area machined.
10. Pistol-grip mounting area threaded.
11. Selector-lever detent hole drilled.

Mr. Tilden Smith                                                   Page 2

The machining operations <u>not</u> yet performed are as follows:

1. Milling out of fire-control cavity.
2. Selector-lever hole drilled.
3. Cutting of trigger slot.
4. Drilling of trigger pin hole.
5. Drilling of hammer pin hole.

The FTB examination of your submitted casting found that <u>**SAMPLE #1**</u> is not sufficiently complete to be classified as the frame or receiver of a firearm and thus would <u>not</u> be a "firearm" as defined in the GCA.

# Exhibit 'I'

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Martinsburg, WV 25405*

www.atf.gov

903050:MCP
3311/302035

MAY 0 5 2014

Mr. Bradley Reece
Palmetto State Defense, LLC
555 East Suber Road
Greer, SC 29650

Dear Mr. Reece,

This is in reference to your correspondence to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), which accompanied your prototype sample of an AR-10 type receiver blank your company intends to manufacture and market. Specifically, you requested an examination and classification of the submitted sample pursuant to the amended Gun Control Act of 1968 (GCA) and asked if it would be regulated as a "firearm" under the GCA.

As background, the GCA, 18 U.S.C. § 921(a)(3), defines the term "firearm" to include *any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive...[and]...the frame or receiver of any such weapon....*

*Note: FTB uses the following terms to describe certain items (also see citation, p.3)—*

*The term "receiver blank" is used to describe forgings, castings, or machined bodies (defense articles¹) such as AR-15 receiver castings, AK receiver flats, etc., in various stages of folding/machining which are not classified as firearms.*

*The term "incomplete receiver" is used to describe forgings, castings, or machined bodies (defense articles) which have been classified as firearms but are not completely machined for use as a functional firearm receiver.*

*The term "receiver" is used to describe functional firearms frames or receivers.*

Case 3:14-cv-01679-JLS-KSC Document 12-3 Filed 10/23/14 PageID.348 Page 67 of 71
Case 1:14-cv-01211-JAM-SAB Document 1 Filed 07/31/14 Page 30 of 44
Mr. Bradley Reese Page 2

As you are aware, FTB has previously determined that an AR-10 type receiver blank which has <u>no machining of any kind performed in the area of the trigger/hammer (fire-control) recess</u> might not be classified as a firearm. Such a receiver blank could have **all** other machining operations performed, including pivot-pin and takedown-pin hole(s) and clearance for the takedown-pin lug, but must be completely solid and un-machined in the fire-control recess area. We have determined that in order to be considered "completely solid and un-machined in the fire-control recess area," the takedown-pin lug clearance area must be no longer than 1.6 inches, measured from immediately forward of the front of the buffer-retainer hole.

Our examination of the submitted item confirmed that the receiver blank has been partially machined, including a takedown pin hole and clearance for the takedown-pin lug. Our examination confirmed that the takedown-pin lug clearance area is less than 1.6 inches, measured from immediately forward of the front of the buffer-retainer hole (see photos below). The sample is completely solid and un-machined in the fire-control recess area and, accordingly, is <u>not</u> a "firearm" as defined in the GCA.



**Submitted prototype sample**

To facilitate return of the submitted sample, please provide FTB with an appropriate FedEx or similar account number within 60 days of receipt of this letter.

We thank you for your inquiry and trust the foregoing has been responsive to your request.

Sincerely yours,

Earl Griffith
Chief, Firearms Technology Branch

Case 3:14-cv-01679-JLS-JES Document 12-3 Filed 10/23/14 PageID.349 Page 68 of 71
Case 3:14-cv-00546-JLS-BGS Document 30-13 Filed 09/22/14 Page 4 of 4
Case 1:14-cv-01211-JAM-SAB Document 1 Filed 07/31/14 Page 31 of 44

---

[1] **TITLE 27 CFR CHAPTER II**
**PART 447—IMPORTATION OF ARMS, AMMUNITION AND IMPLEMENTS OF WAR**

**Subpart B—Definitions**
**§ 447.11 Meaning of terms.**

**Defense articles.** Any item designated in § 447.21 or § 447.22. This term includes models, mockups, and other such items which reveal technical data directly relating to § 447.21 or § 447.22. For purposes of Category XXII, any item enumerated on the U.S. Munitions List (22 CFR Part 121).

**Subpart C—The U.S. Munitions Import List**
**§ 447.21 The U.S. Munitions Import List.**

The U.S. Munitions List compiled by the Department of State, Office of Defense Trade Controls, and published at 22 CFR 121.1, with the deletions indicated, has been adopted as an enumeration of the defense articles subject to controls under this part. The expurgated list, set out below, shall, for the purposes of this part, be known as the U.S. Munitions Import List:

**THE U.S. MUNITIONS IMPORT LIST**
**CATEGORY I—FIREARMS**
(a) Nonautomatic and semiautomatic firearms, to caliber .50 inclusive, combat shotguns, and shotguns with barrels less than 18 inches in length, and all components and parts for such firearms.
(b) Automatic firearms and all components and parts for such firearms to caliber .50 inclusive.
(c) Insurgency-counterinsurgency type firearms of other weapons having a special military application (e.g. close assault weapons systems) regardless of caliber and all components and parts for such firearms.
(d) Firearms silencers and suppressors, including flash suppressors.
(e) Riflescopes manufactured to military specifications and specifically designed or modified components therefor..

NOTE: Rifles, carbines, revolvers, and pistols, to caliber .50 inclusive, combat shotguns, and shotguns with barrels less than 18 inches in length are included under Category 1(a). Machineguns, submachineguns, machine pistols and fully automatic rifles to caliber .50 inclusive are included under Category 1(b).

**§ 447.22 Forgings, castings, and machined bodies.**
Articles on the U.S. Munitions Import List include articles in a partially completed state (such as forgings, castings, extrusions, and machined bodies) which have reached a stage in manufacture where they are clearly identifiable as defense articles. If the end-item is an article on the U.S. Munitions Import List, (including components, accessories, attachments and parts) then the particular forging, casting, extrusion, machined body, etc., is considered a defense article subject to the controls of this part, except for such items as are in normal commercial use.

Exhibit 'J'

Case 3:14-cv-01679-JLS-KSC   Document 12-3   Filed 10/23/14   PageID.351   Page 70 of 71
Case 3:14-cv-00548-JLS-BGS   Document 85-14   Filed 09/29/14   Page 2 of 3
Case 1:14-cv-01211-JAM-SAB   Document 1   Filed 07/31/14   Page 43 of 44





Case 3:14-cv-01679-JLS-KSC Document 12-3 Filed 10/23/14 PageID.352 Page 71 of 71
Case 3:14-cv-00848-JLS-BGS Document 85-14 Filed 09/29/14 Page 3 of 3
Case 1:14-cv-01211-JAM-SAB Document 1 Filed 07/31/14 Page 44 of 44



